**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **Snik LLC,**<br><br>    **Plaintiff,**<br><br>  **v.**<br><br>**Samsung Electronics Co., Ltd.; and Samsung Electronics America, Inc.,**<br><br>    **Defendants.** | **Civil Action No. 2:19-cv-00387-JRG** |

## PLAINTIFF SNIK LLC'S OPENING CLAIM CONSTRUCTION BRIEF

Pursuant to P.R. 4-5(a) Plaintiff Snik LLC ("Snik") respectfully submits its Opening Brief on claim construction.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................1

II.   BACKGROUND ....................................................................................2

III.  APPLICABLE LAW ..............................................................................2

IV.   CLAIM TERMS OF THE '329 AND '556 PATENTS SAMSUNG SEEKS TO
      HAVE CONSTRUED ............................................................................4

    A.   "activation signal"...........................................................................5

        1.   POSITAs Readily Understand "Activation signal" And Thus It
            Requires No Construction.................................................................5

        2.   The Court Should Give The Term "Activation Signal" Its Plain
            And Ordinary Meaning ...........................................................9

            a.   The claims make clear an "activation signal" is different from
                a "signal that starts an operation on an electronic device." ...........10

            b.   The specifications make clear an "activation signal" is not a
                "signal that starts an operation on an electronic device." .............12

            c.   The prosecution history of the '556 Patent does not establish
                clear and unmistakable disclaimer of claim scope.........................14

            d.   The Court should disregard Samsung's proffer of needless
                and confusing extrinsic evidence ................................................17

    B.   "deactivation signal"......................................................................18

    C.   "coupled and "decoupled" ...........................................................19

        1.   POSITAs Readily Understand "Coupled" and "Decoupled" Such
            That These Terms Require No Construction ...................................19

        2.   The Court Should Give the Terms "Coupled" And "Decoupled"
            Their Plain And Ordinary Meaning .................................................22

            a.   The claims make clear that "coupled" and "decoupled" do not
                require "physical connection" nor "physical separation." .............23

            b.   The specifications make clear that "coupled" and "decoupled"
                do not require "physical connection" nor "physical
                separation." .................................................................................25

c.   The prosecution history does not establish clear and
unmistakable disclaimer of claim scope ........................................27

d.   The Court should disregard Samsung's proffer of needless and
confusing extrinsic evidence.........................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*
  725 F.3d 1315 (Fed. Cir. 2013) ...............................................................................15

*Alloc, Inc. v. ITC*
  342 F.3d 1361 (Fed. Cir. 2003) .................................................................................3

*Barnhart v. Thomas*
  540 U.S. 20 (2003) ....................................................................................................8

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*
  262 F.3d 1258 (Fed. Cir. 2001) .................................................................................2

*Bicon, Inc. v. Straumann Co.*
  441 F.3d 945 (Fed. Cir. 2006) .................................................................................15

*Bradford Co. v. Conteyor N. Am., Inc.*
  603 F.3d 1262 (Fed. Cir. 2010) ...............................................................................21

*Charles E. Hill & Assoc. v. Abt Elecs., Inc.*
  No. 2:09-CV-313-JRG, 2012 WL 72714 (E.D. Tex. Jan. 10, 2012)...........................22

*Comark Commc'ns, Inc. v. Harris Corp.*
  156 F.3d 1182 (Fed. Cir. 1998) .................................................................................3

*Constant v. Advanced Micro-Devices, Inc.*
  848 F.2d 1560 (Fed. Cir. 1988) ..............................................................................3, 4

*Cordis Corp. v. Boston Sci. Corp.*
  561 F.3d 1319 (Fed. Cir. 2009) ...............................................................................15

*C.R. Bard, Inc. v. U.S. Surgical Corp.*
  388 F.3d 858 (Fed. Cir. 2004) ................................................................................2, 4

*CVI/Beta Ventures, Inc. v. Tura LP*
  112 F.3d 1146 (Fed. Cir. 1997) ..........................................................................11, 24

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*
  672 F.3d 1270 (Fed. Cir. 2012) ...............................................................................15

*GE Lighting Solutions, LLC v. AgiLight, Inc.*
  750 F.3d 1304 (Fed. Cir. 2014) ...............................................................................15

*Home Diagnostics, Inc. v. Lifescan, Inc.*
  381 F.3d 1352 (Fed. Cir. 2004) .........................................................................4, 6, 14

iii

*In re Translogic Technology, Inc.*
    504 F.3d 1249 (Fed. Cir. 2007) ..................................................................21

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*
    381 F.3d 1111 (Fed. Cir. 2004) ...............................................................2, 5

*Interactive Gift Exp., Inc. v. Compuserve Inc.*
    256 F.3d 1323 (Fed. Cir. 2001) ..................................................................3

*Laitram Corp. v. NEC Corp.*
    163 F.3d 1342 (Fed. Cir. 1998) ....................................................10, 11, 23

*Markman v. Westview Instruments, Inc.*
    52 F.3d 967 (Fed. Cir. 1995) ...................................................................3, 4

*MEMS Tech. Berhad v. Int'l Trade Comm'n*
    447 F.App'x 142 (Fed. Cir. 2011)............................................................ 21

*Mondelez Global LLC v. U.S.*
    253 F.Supp.3d 1329 (Ct. Intl Trade 2017) ................................................8

*Mycogen Plant Sci., Inc. v. Monsanto Co.*
    252 F.3d 1306 (Fed. Cir. 2001) ................................................................11

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC.*
    403 F.3d 1364 (Fed. Cir. 2005) ................................................................12

*NTP, Inc. v. Research In Motion, Ltd.*
    418 F.3d 1282 (Fed. Cir. 2005) ................................................................11

*PC Connector Solutions LLC v. SmartDisk Corp.*
    406 F.3d 1359 (Fed. Cir. 2005) .................................................................6

*Phillips v. AWH Corp.*
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................ 2, 3, 4, 10

*Purdue Pharma L.P. v. Endo Pharms., Inc.*
    438 F.3d 1123 (Fed. Cir. 2006) ...............................................................14

*SimpleAir, Inc. v. Google, Inc.*
    No. 2:13-CV-0937-JRG, 2015 WL 1906016 (E.D. Tex. Apr. 27, 2015)...............21, 22

*Southwall Techs., Inc. v. Cardinal IG Co.*
    54 F.3d 1570 (Fed. Cir. 1995) ............................................................11, 24

*Teleflex, Inc. v. Ficosa N. Am. Corp.*
    299 F.3d 1313 (Fed. Cir. 2002) .............................................................3, 11

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*
    375 F.3d 1341 (Fed. Cir. 2004) .................................................................6

*Vitronics Corp. v. Conceptronic, Inc.*
     90 F.3d 1576 (Fed. Cir. 1996) ......................................................................3, 4, 10, 12

*WeddingChannel.com, Inc. v. The Knot, Inc.*
     No. 03 Civ. 7369 (RWS), 2005 WL 165286 (S.D.N.Y. Jan. 26, 2005) ....................... 21

## I.    INTRODUCTION

Contrary to well-settled principles of claim construction, Samsung requests that the Court construe the claim terms: "deactivation signal;" "activation signal;" "decoupled;" and "coupled." These terms require no construction.  At most, the Court should give the terms their plain and ordinary meanings in light of the intrinsic evidence.  Samsung's proposed constructions are contrary to the plain language of claims of U.S. Patent Nos. 9,167,329 (the "'329 Patent") (Declaration of John S. Kyle ("Kyle Decl."), ¶2 & Ex. A) and 9,769,556 (the "'556 Patent") (*id.* at ¶3 & Ex. B) (together, the "Patents-in-Suit"); are contrary to use of the terms in the specifications of the Patents-in-Suit; violate the doctrine of claim differentiation; give a claim term different meanings where the term is used several times in the same claim, within the same patent, or in both Patents-in-Suit; import non-existent limitations into the claims; read disclosed embodiments out of the Patents-in-Suit; attempt to fabricate disclaimer of claim scope without evidence of "clear and unmistakable" surrender of scope; create uncertainty in the claims rather than reduce it; and are contrary to construction of similar terms in other claim construction orders of this Court, other District Courts, and the Federal Circuit.

In fact, the words in Samsung's proposed constructions, namely "physically," "physically connected," "physically separated," "an operation," "starts an operation," "stops an operation," and "an operation on an electronic device" do not appear anywhere in the intrinsic evidence excepted in cited prior art, and even then their use is not relevant here.  Thus, to support its attempt to rewrite the claims to include nonexistent limitations, Samsung resorts to needless extrinsic evidence.  A POSITA, the Court and a jury can readily understand the terms based on the intrinsic evidence alone.  Accordingly, the Court should not consider extrinsic evidence.

## II.     BACKGROUND

Rob Honeycutt ("Honeycutt") is the inventor of the Patents-in-Suit.  He is an inventor and entrepreneur.  He grew up in a small town in East Tennessee, but, following a cross-country bicycle trip after art school, he ended up as a bike messenger in San Francisco.  Based on that experience, he founded his first company, the well-known messenger-bag company, Timbuk2.  In 2005, Honeycutt sold his interest in Timbuk2 and contemplated his next venture.  In late 2008, he explored the idea of "cord management" to address the issue of cord tangling that particularly annoyed him as an avid bicyclist.  In early 2012, he conceived of the idea of using magnets to control wireless devices coupled to headphones.  On February 22, 2012; July 13, 2012; and October 10, 2012, Honeycutt filed provisional patent applications to which both the '329 Patent and the '556 Patent claim priority.  Honeycutt spent years and substantial sums of money trying to develop a product to take to market.  Ultimately, he lacked the capital to realize this dream.

## III.     APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To determine the meaning of the claims, courts start by considering the intrinsic evidence.  *Id. at 1313*; *C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc*., 262 F.3d 1258, 1267 (Fed. Cir. 2001).  The intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1314; *C.R. Bard,* 388 F.3d at 861.  Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary

skill in the art at the time of the invention in the context of the entire patent.  *Phillips,* 415 F.3d at 1312-13; *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms.  *Phillips*, 415 F.3d at 1314.  First, a term's context in the asserted claim can be very instructive.  *Id.*  Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent.  *Id.*  Differences among the claim terms can also assist in understanding a term's meaning.  *Id.*  For example, when a dependent claim adds a limitation, it is presumed that the independent claim from which it depends does not include the limitation.  *Id.* at 1314-15.  In fact, the Court may use the language of the claims alone to construe their terms.  *See Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Phillips,* 415 F.3d at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed. Cir. 2002).  The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."  *Teleflex,* 299 F.3d at 1325.  But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'"  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-*

*Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323.  The prosecution history may also supply context for claim construction.  *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004*)* ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'"  *Phillips,* 415 F.3d at 1317 (quoting *C.R. Bard,* 388 F.3d at 862).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms; but, technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id.* at 1318, 1321-22.  Therefore, the Court should not resort to extrinsic evidence unless it cannot construe claim terms based on the claim language, the specification, and the prosecution history—in that order.  In most cases, intrinsic evidence will be sufficient to resolve ambiguities and to determine the meaning of the claim terms.  *Vitronics*, 90 F.3d at 1583.  Only when intrinsic evidence proves inadequate may the Court refer to extrinsic evidence, and even then only as an aid in "coming to the proper understanding of the claims."  *Id.* at 1584; *see Markman*, 52 F.3d at 979-81.

## IV.     CLAIM TERMS OF THE '329 AND '556 PATENTS SAMSUNG SEEKS TO HAVE CONSTRUED

| Claim Term | Snik | Defendants |
|---|---|---|
| activation signal | No Construction required.<br><br>Or, if the Court believes that this term requires construction, then:<br><br>Plain and ordinary meaning, or, alternatively:<br><br>"start signal" | Signal that starts an operation on an electronic device |

| deactivation signal | No construction required.<br><br>Or, if the Court believes that this term requires construction, then:<br><br>Plain and ordinary meaning, or, alternatively:<br><br>"stop signal" | Signal that stops an operation on an electronic device |
|---|---|---|
| decoupled | No construction required.<br><br>Or, if the Court believes that this term requires construction, then:<br><br>Plain and ordinary meaning, or, alternatively:<br><br>"disconnected or disassociated" | Physically separated |
| coupled | No construction required.<br><br>Or, if the Court believes that this term requires construction, then:<br><br>Plain and ordinary meaning, or, alternatively:<br><br>"connected or associated" | Physically connected |

(*See* Kyle Decl. ¶4 & Ex. C (Dkt No. 39-A (Plaintiff's Proposed Constructions and Supporting Evidence) & Ex. D (Dkt No. 39-B (Defendants' Proposed Constructions and Supporting Evidence)).)

> A.  "**activation signal**"

> 1.  **POSITAs Readily Understand "Activation Signal" And Thus It Requires No Construction**

This term does not require construction because a person of ordinary skill in the art ("POSITA") at the time of the inventions was readily familiar with activation signals.  *See Innova*, 381 F.3d at 1116 ("A court construing a patent claim seeks to accord a claim the meaning it would

have to a person of ordinary skill in the art at the time of the invention."); *Home Diagnostics*, 381 F.3d at 1358 ("customary meaning" refers to the "customary meaning in [the] art field"); *see also PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) (meaning of claim "must be interpreted as of [the] effective filing date" of the patent application.)[1]

Remarkably, Samsung admits that the term "activation signal" requires no construction.  In its Petitions for *Inter Partes* Review ("IPR") filed with the United States Patent and Trademark Office ("USPTO"), Samsung said:

> Here, given the close correlation and substantial identity between the prior art references and the challenged claims, Petitioner believes that no express constructions of the claims are necessary to assess whether the prior art reads on the challenged claims. (*See* Kyle Decl. ¶5 & Exs. E-I, (relevant excerpts of IPR Petitions 2020-01324, 2020-01325, 2020-01427, 2020-01428 & 2020-01427).)

Samsung cannot reconcile why no construction of "activation signal" is necessary for purposes of determining validity at the PTAB but tells this Court that construction of "activation signal" is mandatory.  Samsung admitted to the PTAB that the term requires no construction.  The Court should hold Samsung to that admission.[2]

In any event, a POSITA would readily "ascertain from the intrinsic record" the meaning of "activation signal" as used in the claims of the Patents-in-Suit.  *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2004), rev'd on other grounds, 546 U.S. 394 (2006) (The proper definition of a claim term is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record.")  The Patents-in-Suit use "activation

---

[1] All four claim terms Samsung asks the Court to construe appear in the '329 Patent.  Accordingly, the relevant time for determining what a POSITA understood is the priority date of the '329 Patent, the earliest of which is February 22, 2012.

[2] Samsung also advised the PTAB that the terms "deactivation signal," "coupled," and "decoupled" do not require construction.

signal" in the manner it has been used in this art for years before the filing of the provisional applications to which the Patents-in-Suit claim priority:

- "In these embodiments, upon receiving the signal from the earbud engagement detector 1130, the controller 1140 sends a signal to the <u>electronic device activation circuit 1155 to activate the electronic device 1105</u>." (Kyle Decl. Ex. A at 15:53-57; Ex. B at 14:64-67.)

- "The electronic device activation circuit 1155 operates an electronic device 1105 based upon the signal received from the controller 1140." (Kyle Decl. Ex. A at 15:48-50.)

- "The controller is configured to send a signal to an <u>electronic device activation circuit which activates the electronic device</u> when the earphones are decoupled from the one or more magnetically attractable surfaces of the earphones holder body and deactivates the electronic device when the earphones are coupled with the one or more magnetically attractable surfaces of the earphones holder body." (Kyle Decl. Ex. A at 1:62-2:1; Kyle Decl. Ex. B at 2:2-9.)

- "However, the signal sent by the electronic device controller 1140 and the electronic device activation circuit 1155 are able to comprise <u>any wireless signal as known in the art</u>." (Kyle Decl. Ex. A at 16:40-43; Kyle Decl. Ex. B at 15:52-58.)

When reading the term in light of the intrinsic evidence, a POSITA would understand that an "activation signal" is merely a type of signal to a controller or an activation circuit. The plain language of the specification would show a POSITA that an "activation signal" does not "start[] an operation on an electronic device."  Rather, consistent with the claims, the specification, and routine use of the term "activation signal" in the art, a POSITA would understand that an "activation signal" is nothing more than a type of signal to an electronic device controller or to an activation circuit, and would further understand that it is the electronic device controller or the activation circuit "which activates the electronic device…," not the activation signal itself.  (*See e.g.* Kyle Decl. Ex. A at 1:62-64.)

Simple rules of English grammar support this.  The word "which" introduces a relative clause: "The controller is configured to send a signal to an electronic device activation circuit

*which activates the electronic device*…."  As the Supreme Court noted in *Barnhart v. Thomas*, "the grammatical 'rule of the last antecedent' . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows."  540 U.S. 20, 26 (2003) (interpreting "the relative clause 'which exists in the national economy'").

The specification confirms this reading:

In these embodiments, upon receiving the signal from the earbud engagement detector 1130, the controller 1140 sends a signal to the <u>electronic device activation circuit 1155 to activate the electronic device 1105</u>.

(Kyle Decl. Ex. A at 15:53-57.)  So, in this embodiment, the signal to the electronic device activation circuit is for that circuit "to activate the electronic device 1105." (*Id*.)

Moreover, the word "activation" in the term "activation signal" is an attributive noun.  *See, e.g. Mondelez Global LLC v. U.S.*, 253 F.Supp.3d 1329, 1333 (Ct. Intl Trade 2017).  An attributive noun describes the noun that immediately follows it.  (*Id*. (explaining that "food" in "food preparation" is an attributive noun for the kind of "preparation" described in a customs classification, identical "to how the attributive noun 'chicken' in the phrase 'chicken soup' describes what type of soup is meant").  Thus, the word "activation" in the term "activation signal" is more akin to the attributive nouns "brake" in the term "brake signal" or "turn" in the term "turn signal."  The "brake signal" does not activate the brakes, nor does the "turn signal" turn the vehicle.

Samsung's proposed construction is unnecessarily confusing, as it introduces additional terminology into the claims—terminology that finds no support in the claims, specifications, or file histories.  The terms "an operation," "signal that starts an operation," and "an operation on an electronic device" do not appear anywhere in the claims or the specifications. (Kyle Decl. ¶6.)

Further evidence that POSITAs would readily understand the term "activation signal" is use of the term in the art, for example in patents and patent applications, including Samsung's use of the term in its own patents and applications.  Samsung regularly uses the term "activation signal"

consistently with its use in the Patents-in-Suit.  For example, in U.S. Patent Application 13/337,537 filed on December 27, 2007 disclosing and claiming a Video Telephony Method and Apparatus of a Mobile Terminal, Samsung used the term "activation signal" as follows:

> The above structured <u>mobile terminal activates the camera module 200</u> to capture a video image <u>in response to</u> the video telephony call <u>activation signal input</u> made by means of an input unit or a touch screen and transmits a video telephony call request message to the counterpart terminal by means of the communication module 100.

(*Id*. at ¶7 & Ex. J (U.S. Patent Pub. No. 2012/0169828A1) at ¶ 0040 (emphasis added).) Samsung does not use the term "activation signal" in its own patents and applications to mean a "signal that starts an operation on an electronic device."  Instead Samsung uses it consistently with its use by POSITAs at the time of the invention of the Patents-in-Suit—a type of signal.

The Court need not construe "activation signal" because a POSITA can ascertain its meaning based on the intrinsic evidence alone.  Samsung told the PTAB as much.  The meaning derived from the intrinsic evidence is entirely consistent with how POSITA's—including Samsung inventors—used the term "activation signal" for years before the provisional applications.

## 2. The Court Should Give the Term "Activation Signal" Its Plain And Ordinary Meaning

If the Court believes construction of "activation signal" is necessary—and it is not necessary—the Court must give this term its plain and ordinary meaning.  The claims and the specifications make clear that an "activation signal" is simply a signal to a controller or activation circuit, which controller or activation circuit in turn control an electronic device.  Indeed, where Honeycutt wanted to claim an activation signal that causes some effect, he expressly did so.  As discussed above, the terms "an operation," "signal that starts an operation," and "an operation on

an electronic device" do not appear anywhere in the claims or the specifications. (Kyle Decl. ¶6.)[3]

It would be improper for the Court to import these non-existent limitations into the claims. *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("[A] court may not import limitations from the written description into the claims."). This is especially true where Samsung's proposed construction would read disclosed embodiments out of the claims. *Vitronics*, 90 F.3d at 1583 (stating that a claim interpretation that excludes embodiments is "rarely, if ever, correct and would require highly persuasive evidentiary support").

> **a.   The claims make clear an "activation signal" is different from a "signal that starts an operation on an electronic device."**

The Court should refer first to the language of the claims to construe them. *Phillips*, 415 F.3d at 1314. The claims show that an "activation signal" is not "a signal that starts an operation on an electronic device." For example, Claim 28[b] of the '329 Patent recites:

> wherein the electronic device controller sends a signal the electronic device activation circuit *to activate the electronic device* when the earphones are decoupled from the one or more magnetically attractable surfaces of the earphones holder body.

(Kyle Decl. Ex. A at 26:23-27.)

In Claim 28[b], the signal goes to "the electronic device activation circuit to activate the electronic device…" The signal itself does not "start an operation on an electronic device." Rather, it signals the electronic device activation circuit "to activate the electronic device."

When Honeycutt desired to claim a cause-and effect relationship between a signal and some desired function of an electronic device, he did so. For example, Claim 1[c] of the '556 Patent recites:

> a headphones controller coupled to receive an *activation signal* when a magnetic decoupling is detected as one or more of the magnetic second surfaces of the set of head phone is removed and decoupled from one of the one or more magnetically

---

[3] The words "an operation" and "an operational voltage" only appear in PCT patent applications cited as prior art in the prosecution history of the '556 Patent. (*Id.*)

attractable first surfaces, *wherein that activation signal causes transmitted audio to be played in the headphones.*[4]

(Kyle Decl. Ex. B at 27:1-7.)

Many claims of the Patents-in-Suit do not contain any such cause-effect relationship between the "activation signal" and "an operation on an electronic device" (whatever Samsung may mean by this undefined terminology).  For example, Claim 1[c] of the '329 Patent recites:

an electronic device controller coupled to receive an activation signal when one or more of the set of earphones are decoupled from one of the one or more magnets, wherein the electronic device controller receives a deactivation signal when one or more of the set of earphones are coupled to one or more of the magnets.

(Kyle Decl. Ex. A at 24:35-40.)

Claim 1[c] does not recite that the activation signal itself "*causes*" "an operation" to occur when the earphones are coupled or decoupled from the one or more magnets.  Accordingly, black-letter principles of claim construction forbid the Court from reading such a limitation into the claim.  *See Laitram*, 163 F.3d at 1347 ("[A] court may not import limitations from the written description into the claims."); *see Teleflex*, 299 F.3d at 1326-27 (declining to limit a claim to a preferred embodiment where there was no evidence of disclaimer).

Some claims do, in fact, include the word "start" as a claim limitation, demonstrating that when Honeycutt wanted to claim that an activation signal "starts" something, he knew how to claim it.  For example, dependent Claim 48 of the '556 Patent recites:

The method of claim 28 wherein the *activation signal causes* the electronic device *to start transmitting* audio to be played in the headphones.

---

[4] It is presumed that claim terms mean the same thing across all claims in a patent.  *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995) .  Indeed, Courts should also construe the same term consistently across related patents.  *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 252 F.3d 1306, 1311 (Fed. Cir. 2001) (vacated on other grounds, 535 U.S. 1109, (2002)); *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).  Samsung concedes this and advocates for the same construction of the terms across both Patents-in-Suit.  (Kyle Decl. Ex. D.)

(Kyle Decl. Ex. B at 32:8-10 (emphasis added); *see also Id*. at 32:23-25 (Claim 53).)

The Court should not construe an independent claim to include a limitation added by a dependent claim.  *See Nazomi Commc'ns, Inc. v. Arm Holdings, PLC.*, 403 F.3d 1364, 1370 (Fed. Cir. 2005) ("Claim differentiation normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend").  Independent Claim 28 of the '556 Patent (from which Claim 48 depends) does not say that the activation signal "starts" "an operation on an electronic device," whereas dependent Claim 48 says that the activation signal causes the electronic device "to start transmitting audio to be played in the headphones." Accordingly, the Court must not import the word "start" into the broader claims.  As a matter of law, there is a difference between "causing transmitted audio to be played" (as claimed in independent Claim 28[b]) and "causes the electronic device to <u>start</u> transmitting audio…" (as claimed in dependent claim 48).

In Samsung's nonsensical construction, dependent Claim 48 is redundant of the cited language from Claim 28[c] because the activation signal arguably starts the transmission of transmitted audio twice.  Again, the doctrine of claim differentiation requires the Court to give full effect to claim language.  "Causing" transmitted audio to be played in the earphones is broader than "causing the electronic device *to start* transmitting audio" to be played in the headphones. Samsung's proposed construction cannot be proper as a matter of law.

### b. The specifications make clear an "activation signal" is not a "signal that starts an operation on an electronic device."

The specification makes clear it is the electronic device controller or the electronic device activation circuit that controls an electronic device, not an activation signal.  Indeed, Samsung's proposed construction impermissibly reads disclosed embodiments out of the patents. *See Vitronics*, 90 F.3d at 1583 (stating that a claim interpretation that excludes embodiments is "rarely,

if ever, correct and would require highly persuasive evidentiary support"). For example, the '329 Patent discloses: "The electronic device activation circuit 1155 <u>operates an electronic device 1105 based upon the signal received from the controller 1140;</u>" and, "Particularly, the controller is configured to send a signal to an <u>electronic device</u> <u>activation circuit which operates the electronic device in a manner dependent upon the signal</u>." (Kyle Decl. Ex. A 15:48-50 and 2:3-6 (emphasis added).) Thus, in these disclosed embodiments, it is the activation circuit "which operates the electronic device" and such operation is in a manner consistent with the signal. These embodiments would make no sense if it were the signal that "starts an operation on an electronic device" because it would be the signal operating the electronic device "in a manner dependent upon" itself. Accordingly, Samsung's proposed construction cannot be correct.

Samsung's proposed construction reads other disclosed embodiments out of the patents as well. The '329 Patent discloses: "In further embodiments, the electronic device controller is configured to activate the electronic device when the earphones are decoupled from the holder body. In still further embodiments, the electronic device controller is configured to deactivate the electronic device when the earphones are coupled with the holder body." (Kyle Decl. Ex. A at 2:64-67.) If the activation signal "starts an operation on an electronic device," then the controller is not "activating" the electronic device "when the earphones are decoupled from the holder body." This is meaningful in the claims themselves. For example, Claim 1[c] of the '329 Patent recites: "an electronic device controller coupled to receive an activation signal when one or more of the set of earphones are decoupled from the one or more magnets…" In Claim 1[c], if the activation signal itself "starts an operation on an electronic device," then there would be no need for the electronic device controller to appear in the claim at all because the electronic device controller

would not be "activat[ing] the electronic device when the earphones are decoupled from the holder

body" as the disclosed embodiment at 2:64-3:3 of Kyle Decl. Ex. A says it should.

> ### c. The prosecution history of the '556 Patent does not establish clear and unmistakable disclaimer of claim scope.

Snik anticipates that Samsung will try to manufacture disavowal where there is none,

tacitly admitting the weakness of its proposed constructions.  The Court should not be fooled.  Snik

is entitled to the full scope of the claims in the Patents-in-Suit.

Only a "clear and unmistakable disavowal of scope" amounts to disclaimer.  *See Home*

*Diagnostics*, 381 F.3d at 1358 ("Absent a clear disavowal or contrary definition in the specification

or the prosecution history, the patentee is entitled to the full scope of its claim language."); *see*

*also Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) (only "a

clear and unmistakable disavowal of scope during prosecution" may affect the construction of a

claim term).

During prosecution of the application that resulted in issuance of the '556 Patent,

Honeycutt amended claims to recite that an activation signal "causes transmitted audio to be played

in the headphones."  (Kyle Decl. ¶8 & Ex. K (March 23, 2017 Response to Office Action ("March

23 ROA") at pp.12-13.)  He did not, however, disclaim the full breadth of claim scope with respect

to the term "activation signal."  In fact, in the March 23 ROA, Honeycutt was entirely consistent

with the specification:

> The controller is configured to send a signal to an **electronic device activation circuit which activates the electronic device** when the earphones are removed and decoupled from the one or more magnetically attractable surfaces of the earphones holder body **and deactivates the electronic device** when the earphones are coupled with the one or more magnetically attractable surfaces of the earphones holder body. In some further embodiments, external audio is transmitted through the headphones.

(*Id.* at 13 (emphasis added).)

Honeycutt's addition of the language "causes the transmitted audio to be played in the headphones" is not a "clear and unmistakable disavowal" of a broader interpretation of "activation signal."   The standards for finding disavowal are "exacting."  *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).  To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender.  *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009).  "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable."  *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).  Here, at the very least, Honeycutt's March 23 ROA is subject to multiple reasonable interpretations.  Therefore, it is not a clear and unmistakable disclaimer as a matter of law.

The language of the claims themselves and the prosecution history demonstrate that it is possible to have "activation signals" that do not cause "transmitted audio to be played in the headphones."  If the term "activation signal" meant only a signal that "causes" transmitted audio to be played in the earphones, as Samsung must argue to support an assertion of disclaimer, then the language "causes transmitted audio to be played in the earphones" is superfluous in the context of the claims of the '556 Patent.  *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim"); *see also Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (rejecting a claim construction that caused other claim language to be "superfluous" as "contrary to [*Bicon's*] well-established rule").  For example, Honeycutt could have amended then-pending Claim 1[c] to read:

> A headphones <u>controller coupled to receive an activation signal</u> when a magnetic decoupling is detected as one or more of the magnetic second surfaces of the set of

head phones is removed and decoupled from the one or more magnetically attractable first surfaces.

But he did not do so.  Instead, in the March 23 ROA Honeycutt amended then-pending Claim 1[c] to read:

> A headphones <u>controller coupled to receive an activation signal</u> when a magnetic decoupling is detected as one or more of the magnetic second surfaces of the set of head phones is removed and decoupled from the one or more magnetically attractable first surfaces, <u>wherein the activation signal causes transmitted audio to be played in the headphones</u>.

(Kyle Decl. Ex. K at p.2 (emphasis altered).)  In other words, the term "activation signal" standing alone in the first line of the claim is <u>broader</u> than an activation signal that "causes transmitted audio to be played in the headphones."  And that is precisely because it is not the activation signal that "activates the electronic device" but rather, as Honeycutt advised the patent examiner in this instance, it is the "<u>electronic device controller which controls operation of the electronic device</u>. The controller is configured to send a signal to an electronic device <u>activation circuit which activates the electronic device</u>…." (*Id.* at p.13 (emphasis added).)

   This is entirely consistent with the claims and the specification, which make clear that an "activation signal" is just a type of signal that signals another component (*i.e.* an electronic device controller or an electronic device activation circuit) to activate an electronic device.  An "activation signal" can "cause" transmitted audio to play on the earphones by signaling a controller or an activation circuit to activate the electronic device, which, in turn, transmits audio to the earphones. That does not mean that the "activation signal" itself "starts an operation on an electronic device." At the very least, Honeycutt's statements in the March 23 ROA are amenable to "reasonable interpretations" and therefore cannot be deemed "clear and unmistakable" disclaimer.

### d.   The Court should disregard Samsung's proffer of needless and confusing extrinsic evidence.

In an attempt to cloud the issue, Samsung proffers a surfeit of extrinsic evidence, again tacitly admitting that the intrinsic evidence does not support its proposed construction of "activation signal."  The Court need only look to the dictionary definitions Samsung offers to see that it jousts windmills.

Samsung cites to the Wiley Electrical and Electronics Engineering Dictionary, presumably for the definition of "activation." (Kyle Decl. Ex. D at p.2; *id.* at ¶9 & Ex. L.)  But the various definitions there do not clarify whether the claimed "activation signal" is "a signal that starts an operation on an electronic device."  The first definition, "the initiation of a sequence or process" does not require that an "activation signal" itself actually "start" any operation, especially where the intrinsic evidence is clear that it is the electronic device controller or the electronic device activation circuit "which activate the electronic device."  In other words, a signal can "initiate a sequence or process" without actually being the thing that ultimately "starts an operation on an electronic device."  Moreover, there are alternative definitions for "activation" that align more with Snik's interpretation. For example: "4.  The inducing into an action."  The activation signal "induces" either the electronic device controller or the electronic device activation circuit into action, and the controller or the activation circuit, in turn, activates the electronic device. Samsung's proffer of this dictionary definition creates more confusion than it solves and cannot outweigh the intrinsic record set forth above.

Similarly, Samsung proffers the definition of "activation" from Newton's Telecom Dictionary.  (Kyle Decl. Ex. D at p.2.; *id.* at ¶10 & Ex. M.)  But this dictionary bears a copyright date from <u>after</u> the filing dates of the provisional applications that resulted in the '329 Patent: "copyright © 2013."  Accordingly, this dictionary is not usable as extrinsic evidence as a matter

of law because it would not inform a POSITA of the meaning of "activation" <u>at the time of the invention</u>.  Besides, the definition in this dictionary is not congruent with the definition in the Wiley dictionary that Samsung also cites.  Differing definitions from two different sources cannot possibly serve to outweigh the intrinsic evidence and rewrite the claims.  Newton's definition of "activation" is: "To make something active. To make it work."  It then goes on to describe the process of provisioning a cell phone on a provider's network so that "the phone can make and receive calls."  Again, this cherry-picked definition creates more confusion than it solves in the context of the Patents-in-Suit.  The language of the claims and the specifications make clear the "activation signal" alone does not make an electronic device "work" for transmission of audio to the earphones.  The signal merely signals other components to "make it work."  Indeed, the definition "to make something activate" supports Snik's interpretation—the "activation signal" signals the controller or the activation circuit to "activate" the electronic device.  Nothing in the dictionary definitions Samsung offers justifies deviating from the plain and ordinary meaning.

**B.    "deactivation signal"**

The arguments above with respect to "activation signal" apply equally to the term "deactivation signal."  Indeed, most claims reciting an activation signal also recite a deactivation signal. (Kyle Decl. Ex. A at Claims 1, 10, 36, 49 53 and their dependent claims; Kyle Decl. Ex. B at Claims 23, 28, 29, 36, 38, 39, 40, 42, 47, 49, 52, 54.)  As with the term "activation signal," when Honeycutt wanted to claim that a "deactivation signal" stopped something, he claimed it expressly: "49. The method of claim 48 wherein the deactivation signal causes the electronic device to <u>stop</u> transmitting audio to be played in the headphones." (Kyle Decl. Ex. B at 32:12-14; *see also* Claim 54 at 32:27-29 (same).)   And like "activation signal," the terms "an operation," "stops an operation," and "an operation on an electronic device" do not appear anywhere in the claims or the

specifications. (Kyle Decl. ¶6.)  The Court should refuse Samsung's proffered construction on that basis alone.    The term "deactivation signal" does not appear in the specifications, so the term is defined by its opposite, an "activation signal."  A "deactivation signal" is therefore merely a type of signal to another component, which component in turn deactivates an electronic device.

C.    "coupled and "decoupled"

1.   POSITAs Readily Understand "Coupled" And "Decoupled" Such That These Terms Require No Construction

Like the terms "activation signal" and "deactivation signal," the terms "coupled" and "decoupled" require no construction because a POSITA would readily understand them in the context of the Patents-in-Suit.  Again, Samsung has represented to the PTAB that the terms "coupled" and "decoupled" require no construction.  (*See* Kyle Decl. at Exs. E-I.)  The Court should hold Samsung to that admission.

The terms do not require construction, as a POSITA would readily "ascertain from the intrinsic record" the meaning of "coupled" and "decoupled" as used in the claims of the Patents-in-Suit.  The Patents-in-Suit use these terms in the manner POSITAs used them in this art for years before the filing of the provisional applications to which the Patents-in-Suit claim priority:  for example, "In some embodiments, the set of earphones is coupled to an earphones jack of the earphones holder.  In some embodiments, the electronic device is wirelessly coupled to the earphones holder."  (Kyle Decl. Ex. A at 4:9-12.)  Moreover, the claims themselves say that a controller can be "coupled to receive and activation signal…" and that the activation signal can be "sent wirelessly." (*Id*. at Ex. B, Claim 1[c] at 27:1-7 and Claim 45 at 31:31-32; *see also id.* at Ex. A, Claim 43 at 27:43-50 ("wherein the electronic device is wirelessly coupled to the earphones holder.").)  These disclosures establish that a POSITA would readily understand that "coupled" as

used in the Patents-in-Suit is not limited to "physically connected" where the claims and the specifications disclose non-physical (here, wireless) connections.

Further evidence that POSITAs would readily understand the terms "coupled" and "decoupled" comes from other patents and applications in the art, including Samsung's use of the terms in its own patents and applications.  Samsung regularly uses the terms consistently with their use in the Patents-in-Suit.  Samsung's past use of "coupled" and "decoupled" does not require "physical connection" or "physical separation."

For example, U.S. Patent 9,748,913 claims priority to an application filed on September 6, 2007 and discloses an Apparatus and Method for Transmitting/Receiving Voice Signal Through Headset.  There, Samsung claims microphones that are "electrically coupled," "communicatively coupled," or "operatively coupled" with an electronic device, an external device, or an apparatus. (Kyle Decl. ¶11 & Ex. N (U.S. Patent 9,748,913) at 13:35-54.)  In particular, Claim 1 recites the first and second microphones "communicatively coupling" with an "external device." (*Id*.)[5] Nowhere in this patent does Samsung say that the coupling requires "physical connection."

Similarly, in U.S. Patent No. 8,345,429 filed on February 12, 2010 disclosing and claiming a Mobile Terminal Having Detachable Sub-Module, Samsung claims magnetic coupling of the sub-module to the mobile terminal:

- "…the connection unit being configured to detachably couple the sub-module in at least electrical communication with the main terminal" (Kyle Decl. ¶12 & Ex. O, (U.S Patent No. 8,345,429) at Claim 1, 8:67 – 9:2.)

- "…the sub-module 200 is coupled to the main terminal 100 or detached from the main terminal 100 through the magnet 164." (*Id*. at 4:18-20.)

---

[5] *E.g.* a cellular phone that "is connected to a Bluetooth headset 200 via the Bluetooth protocol and transmits data, such as a control signal and a voice signal, etc. to the Bluetooth headset 200.  The portable terminal 100 receives data, such as a control signal and a voice signal, from the Bluetooth headset 200." (*Id*. at 4:33-38.)

- "It will be understood that when an element or layer is referred to as being "on" or "connected to another element or layer, it can be directly on or directly connected to the other element or layer, or intervening elements or layers may be present." (*Id.* at 2:63-67.)

Once again, in its own patents that predate the Patents-in-Suit, Samsung itself does not restrict "coupling" and "decoupling" to "physical connection" or "physical separation." Instead, it used the terms "coupling" and "decoupling" consistent with how a POSITA at the time of the inventions in the Patents-in-Suit would have understood the terms—connected, but not limited to direct physical connection without "intervening elements or layers." Nothing in the claims, the specifications, or the file histories of the Patents-in-Suit would cause a POSITA to think otherwise.

Courts routinely interpret the terms "coupled" and "decoupled" consistent with their use in the art. Use of "coupled" without other limitations, indicates that "coupled" may mean "directly or indirectly connected." *See e.g. Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1270-71 (Fed. Cir. 2010) (finding that the district court erroneously construed the term 'coupled to' to require direct connection of dunnage structures of claimed containers to mean directly attached: "we hold that the term should be construed broadly so as to allow an indirect attachment."); *In re Translogic Technology, Inc.*, 504 F.3d 1249, 1258 (Fed. Cir. 2007); *MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F.App'x 142, 151-52 (Fed. Cir. 2011) (nonprecedential) (finding "electrically coupled" to mean "arranged so that electrical signals may be passed either directly, or indirectly via intervening circuitry, from one component to another"); *WeddingChannel.com, Inc. v. The Knot, Inc.*, No. 03 Civ. 7369 (RWS), 2005 WL 165286, at *10-12 (S.D.N.Y. Jan. 26, 2005) (construing "coupled" to mean "connected, directly or indirectly, to allow the transfer of signals or information").

This Court has itself broadly interpreted the term "coupled" in past cases. In *SimpleAir, Inc. v. Google, Inc.*, "The Court construe[d] 'communicatively coupled' to mean 'connected or

21

associated in a way that permits communication.'" No. 2:13-CV-0937-JRG, 2015 WL 1906016, at*22 (E.D. Tex. Apr. 27, 2015).  "In context of the specification as a whole," the Court explained, "it is clear that these devices are associated together in that the claims are in a manner that allows communication. The specification provides the necessary context to the claimed term." (*Id*. at *21.)

In *Charles E. Hill & Assoc. v. Abt Elecs., Inc.,* this Court held "that 'coupled' means 'connected' and not 'directly connected'" because the intrinsic record offered little support for a "directly connected" construction where the words "direct" and "directly" did not appear in the claims or the specification, there was no clear disclaimer of claim scope, and defendant cited inapposite law to support its construction.  No. 2:09-CV-313-JRG, 2012 WL 72714, at *17-18 (E.D. Tex. Jan. 10, 2012).)  In that case, this Court even considered whether construction of the term "coupled" was "even necessary." *Id.* at *18.  Ultimately, the Court decided that the term "coupled to a remote computer" could be given its plain and ordinary meaning, but that "the word connected is likely easier for a jury to understand." (*Id*.)  Here, similar to *Charles E. Hill*, the words "physically" and "physically connected" do not appear anywhere in the claims or the specifications. (Kyle Decl. ¶13.)

A POSITA would understand that the generic terms "coupled" and "decoupled," used without precursor modifiers, to encompass any sort of coupling and decoupling in this art, to include indirect and non-physical coupling and decoupling (*e.g.* the disclosure of "wirelessly coupled" discussed above).  The terms "coupled" and "decoupled" do not require construction.

## 2.  The Court Should Give The Terms "Coupled" And "Decoupled" Their Plain And Ordinary Meaning

If the Court believes construction of "coupled" and "decoupled" is necessary—and it is not—the Court must give these terms their plain and ordinary meaning.  The claims and the specifications make clear that "coupled" does not require "physical connection."  Indeed, the

specification is replete with examples of Honeycutt using the words "couple," "coupled," and "coupling" to cover non-physical connections, such as the wireless coupling between an electronic device (*e.g.* a mobile phone) and an earphones holder.  (Kyle Decl. Ex. A at 4:9-12.)  Nor do the claims or the specifications limit the terms "coupled" and "decoupled" to a direct connection between two things with no intermediate material or structures between the two. The terms "physically connected" and "physically separated" do not appear anywhere in the claims or the specifications. (Kyle Decl. ¶13.)   Accordingly, it would be improper for the Court to import these non-existent limitations into the claims.  *See Laitram*, 163 F.3d at 1347.

> ### a.   The claims make clear that "coupled" and "decoupled" do not require "physical connection" nor "physical separation."

The Court need only look at Claim 1 of the '329 Patent to see that Honeycutt used the words "coupled" and "decoupled" broadly, without any limitation to "physically connected" or "physically separated":

> 1[b] a set of earphones comprising a magnetically attractable surface for removably <u>coupling with</u> the one or more magnets; and
>
> 1[c] an electronic device controller <u>coupled to receive an activation signal</u> when one or more of the set of earphones are <u>decoupled</u> from the one or more magnets, wherein the electronic device controller receives a deactivation signal when one or more of the set of earphones are <u>coupled</u> to one of the one or more magnets.

In Claim 1 of the '329 Patent, the electronic device controller is "coupled to receive an activation signal" even though it has no direct, physical connection to the earphones or the magnets.  For example, Figure 11 illustrates a controller (1140) in a holder body (1101) where the controller has no direct physical connection to the earphones (1175), the magnets (1185), the magnetically attractable surfaces (1110), or the activation circuit (1155):



**Fig. 11**

Honeycutt's use of "coupled" for the non-physical connection between an electronic device controller and the set of earphones in Claim 1 creates a conundrum for Samsung.  So Samsung tells the Court that Honeycutt used the word "coupled" inconsistently in the Patents-in-Suit.  To make its proposed construction work, Samsung argues that the term means something different when it "involves magnetism" from what the word means when used in all the other contexts in the Patents-in-Suit—and indeed from its different use within the same claim.  (Kyle Decl. Ex. D at p.6, n1.)  That is nonsense.  It also ignores well-settled law.  Claim terms should mean the same thing across all claims in a patent. *CVI/Beta Ventures*, 112 F.3d at 1159 ("We are obliged to construe the term 'elasticity' consistently throughout the claims"); *Southwall Techs.*, 54 F.3d at 1579 (holding that claim terms found in different claims should be interpreted consistently); *see also* n1, *supra*.

Honeycutt also used the claim term "connected" in the claims of the '556 Patent to denote a non-physical connection of a phone call, so "coupled" cannot be limited to "physically connected."  For example, Claim 41 recites: "The audio system of Claim 1 wherein the activation signal causes an incoming call to a telephone to be answered and <u>connected</u> and further wherein transmitted audio comprises audio for the call." (Kyle Decl. Ex. B at 31:12-15 (emphasis added); *see also id.* at Claims 46 at 32:1-4; and Claim 51 at 32:16-19.)  Honeycutt knew how to claim

using the word "connected" and only did so for non-physical connections.  If Honeycutt intended

for "coupled)" to mean "physically connected" only where it "involves magnetism," he would

have claimed it.

When Honeycutt wanted to claim a physical connection, he often used the claim term

"attached to," as, for example, in dependent Claim 9: "The system of claim 1 wherein the

magnetically attractable surface is <u>attached to</u> the cord of the earphones." (Kyle Decl. Ex. A at

24:58-59 (emphasis added); *see also id.* at Claim 22[b] at 25:53-54 ("one more magnetically

attractable surfaces attached to the holder body;" Claim 37[b] at 37:9-11 (same); Claim 54[b] at

28:41 ("one or magnets attached to the holder body").)

Because "coupled" cannot possibly mean "physically connected" in the context of the

claims, construing the term "decoupled" to mean "physically separated" would be equally

problematic.  Again, the words "physically" and "physically separated" do not appear in the claims

and should not be imported into the terms "coupled" and "decoupled." (Kyle Decl. ¶13.)

      **b.**    **The specifications make clear that "coupled" and "decoupled" do
not require "physical connection" nor "physical separation."**

The specifications of the Patents-in-Suit do not use the words "physical," "physically,"

"physically connected," or "physically separated." (*Id.*)  The specifications, however, use the

words "connect," "connected," or "connection" fourteen times in the '329 Patent and fifteen times

in the '556 Patent. (Kyle Decl. ¶14.)  The specifications use the words "attach," "attached,"

"attaching," or "attachment" 31 times in the '329 Patent and twenty times in the '556 Patent.  (Kyle

Decl. ¶15.)  What is clear from Honeycutt's choice of the words "connect" and "attach" and their

variants is that "connect" encompasses both physical connections and non-physical connections,

while "attach" refers to physical connections.

For example, all 51 uses of the word "attach" and its variants in the specifications concern physical connection of things.[6]  In one instance Honeycutt even used "attached" in reference to a magnetic mechanism for physically attaching a holder body to a bag or article of clothing.  (*Id*. at Ex. A at 7:37-39.)  That is proof positive that when Honeycutt intended magnetic attachment to mean "physically connected," he said it plainly by using the word "attached" and not "coupled."

Moreover, the specification repeatedly says that magnets or magnetically attractable surfaces can be "encased or embedded within a plastic over mold…" (*Id*. at 6:11-14; *see also, e.g.* 5:63-65, 6:44-48), "built into the body…" (*id*. at 6:57-58, 7:24-26, 7:55-56),  or "embedded within the body" (*id*. at 7:52-53, 13:3-4).)  Magnets or magnetically attractable surfaces "embedded within" a structure by a "plastic over mold" or otherwise cannot directly, physically connect with other structures.  But the specification repeatedly refers to magnets or magnetically attractable surfaces "coupling" with other structures. If "coupled" meant "physically connected," these disclosures would be nonsensical, and such embodiments would be read out of the claims.  The following disclosure from the '329 specification is dispositive on this point: "A user <u>places a set of earphones near to the magnet</u> in order to allow the earphones to <u>magnetically attract to and be held by the magnet</u>…Then, when the user no longer wishes to use the electronic device, the earphones are <u>recoupled with </u>the magnet and the electronic device is deactivated." (*Id*. at 20:47-55 (emphasis added); *see also id*. at 14:20-23 ("Then, when not listening to the electronic device,

---

[6] *See e.g.* Kyle Ex. A at 2:24-26; (attachment of magnetically attractable surfaces to the cord of earphones); 2:28-31, 2:44-46, 3:6-9, 14:59-63, 17:57-63, 19:19-24  (buckle attachment as a type of holder body); 2:56-60, 3:52-57, 7:52-55, 9:40-43, 13:4-6  (magnet or magnetically attractable surfaces attached to the holder body); 3:3-6, 3:34-36, 3:37-39, 4:17-20, 7:34-37 (holder body including mechanism to attach it to an additional article, where the mechanism can be a clip, pin, or magnet ); 6:7-10 (holder body attached to bag or item of clothing); 6:46-48 (magnet separate component attached to snap); 7:17-20, 7:20-23, (attachment of adornment to bag or article of clothing); 7:31-32 (holder body attached to shirt); 9:43-47 (attachment of item to strap); 10:10-11 (clip attached to sports helmet); 11:66-12:3 (attachment by stitching, riveting, heat pressing, adhesive attachment, or chemical method).

a user places a set of <u>earphones near to the magnet in order to allow the earphones to magnetically</u> <u>attract to and be held by magnet</u>" (emphasis added)).)  If magnets are "encased within" a "plastic over mold," then no "physical connection" between the magnets and the earphones is possible when a user places a set of earphones "near to the magnet" to be "magnetically attract[ed] [and] held by the magnet."  As any elementary school child knows, magnetic force can pass through non-magnetic materials—for example school children can and do couple two magnets together with paper or some other non-magnetic material in between them.  Those magnets are "coupled" in the sense of the Patents-in-Suit even though they are not directly "physically connected."

There is abundant disclosure in the specifications to show that Honeycutt did not mean to limit "coupled" to "physically connected."  For the same reasons, "decoupled" does not require "physical separation."  Decoupling can include physical separation, but it does not require it.  Because "coupled" does not require direct physical contact, "decoupled" cannot require physical separation of such physical contact.  Accordingly, it would be error for the Court to import the limitations "physically connected" and "physically separated" into the claims, whether only for instances "involving magnetism" or not.

### c. The prosecution history does not establish clear and unmistakable disclaimer of claim scope.

Because the claims and the specifications do not support Samsung's proposed constructions, Samsung will undoubtedly turn to the tired argument that Honeycutt disclaimed the full breadth of the terms "coupled" and "decoupled."  But there is no such "clear and unmistakable" disclaimer of claim scope.

Samsung cites to an August 11, 2016 Response to Office Action ("August 11 ROA") during prosecution of the '556 Patent in which Honeycutt distinguished a reference (U.S. Patent Application Pub. No. 2013/0129110 to Harper) as follows:

> As described above, Harper teaches that a varying signal is sent to the remote control module based on the *proximity of two magnets*, not on a magnet being **decoupled**.

(Kyle Decl. ¶16, Ex. P (August 11 ROA) at 3).

But nothing in that statement, or anywhere else in the August 11 ROA for that matter, amounts to "clear and unmistakable" disclaimer of the full scope of the terms "couple(d)" and "decoupled." Honeycutt merely pointed out to the examiner that Harper sent a varying signal based on "proximity" and not an activation signal based on decoupling of magnets and/or magnetic surfaces. He made this clear in the first sentence of the same paragraph containing the discussion of Harper's variable signal:

> Harper does not teach a controller <u>coupled to</u> receive an activation signal when one or more of the magnetic second surfaces of the set of headphones are **decoupled** from one or more of the magnetically-attractable surfaces of a holder body.

(*Id*. at 3 (underline added; bold and italics in original).)

Samsung cannot credibly argue that Honeycutt's statement regarding Harper's variable signal based on proximity amounts to disclaimer of the full scope of "couple(d)" and "decoupled" where Honeycutt expressly told the examiner that Harper did not teach an activation signal based on coupling or decoupling.  There is no "clear and unmistakable" disclaimer and no justification for importing the unclear and confusing "physically" limitation into the claims.

Similarly, nothing in Honeycutt's September 30, 2016 Response to Office Action ("September 30 ROA") in the prosecution of the '556 Patent amounts to "clear and unmistakable" disclaimer.  (Kyle Decl. ¶17, Ex. Q.)  In the September 30 ROA, Honeycutt said that: "the claims have been amended to specify that an activation signal is sent when the headphones are removed and decoupled from the one or more magnetically attractable surfaces."  (*Id*. at p.9.)  Again, that statement is not a "clear and unmistakable" disclaimer of the full scope of the terms "coupled"

and "decoupled."  Headphones can be "removed and decoupled" from magnetically attractable surfaces without requiring that the headphones be directly, physically connected to such magnetically attractable surfaces.  Honeycutt made this clear to the examiner in the September 30 ROA, advising that Harper did not reference any headphones controller coupled to receive an activation signal when a magnetic decoupling is detected.  (*Id.* at 10-11.)   Magnetic coupling/decoupling can occur regardless of whether the magnets/magnetically attractable surfaces are "physically connected" or "physically separated."  Honeycutt did not "clearly and unmistakably" disclaim non-physical, magnetic decoupling or coupling.

> ### d.   The Court should disregard Samsung's proffer of needless and confusing extrinsic evidence.

Once again, in an attempt to salvage proposed constructions that are plainly improper based on the claim language, the specifications, and the prosecution history, Samsung vainly advances extrinsic evidence. The Court need not concern itself with any of this extrinsic evidence where the intrinsic evidence is conclusive.  Thus, Snik will not address in detail all the extrinsic evidence Samsung cites. Snik will, however address Samsung's unnecessary dictionary definitions.

As with "activation signal," Samsung cherry-picks a dictionary definition, this time for "couple," from the Oxford dictionary of Mechanical Engineering.  But that dictionary post-dates the filing of the priority provisional application: "© Oxford University Press 2013."  Therefore, it would not have informed a POSITA at the time of filing the provisional applications what the words "couple" or "coupling" meant in the context of these patents. (Kyle Decl. Ex. D at p.8; *id* at ¶18 & Ex. R.)  The Court should disregard that dictionary.

But more importantly, the definition of "couple" in this dictionary has absolutely nothing to do with the words "coupled" and "decoupled" in the Patents-in-Suit.  Rather, it relates to force vectors of equal magnitude but opposite directions and separated by a distance.  The Patents-in-

Suit have nothing to do with mechanical force couples.  In other words, this definition of "couple" does not preclude non-physical, indirect connection of two things in the sense the term is used in the Patents-in-Suit.  Moreover, the definition of "coupling" also has nothing to do with use of the words "coupled" or "decoupled" in the Patents-in-Suit. The dictionary defines coupling as "1. Any mechanical fastening connecting two or more shafts, or parts of a mechanism, *in order to transmit power*. 2. A device for connecting two vehicles."  The Patents-in-Suit have nothing to do with mechanical connections for transmitting power or with connecting two vehicles.  These definitions would not inform a POSITA about "coupling" or "decoupling" as used in patents that read on Bluetooth headsets playing audio from electronic devices, and controlling the playing of such audio through decoupling and coupling of magnets and/or magnetically attractable surfaces.  The dictionary definitions upon which Samsung relies are from a different art and would not inform a POSITA in the art relevant to the Patents-in-Suit.  The Court should disregard Samsung's dubious dictionary definitions.

Dated:  August 26, 2020                          Respectfully submitted,

                                                 **KYLE HARRIS LLP**

                                                 By:      /s/ John S. Kyle
                                                          John S. Kyle
                                                          Lead Attorney
                                                          California State Bar No. 199196
                                                          450 B Street, Suite 1410
                                                          San Diego, CA 92101
                                                          Email:          jkyle@klhipbiz.com
                                                          Telephone:   (619) 600-0644
                                                          Facsimile:    (619) 600-5144

                                                 **ATTORNEYS FOR SNIK LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this 26th day of August, 2020.

/s/ John S. Kyle

John S. Kyle
