**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| SNIK LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:19-cv-00387-JRG |
| | § | |
| SAMSUNG ELECTRONICS CO., LTD. | § | |
| AND SAMSUNG ELECTRONICS | § | |
| AMERICA, INC., | § | |
| | § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the opening claim construction brief of Plaintiff Snik LLC ("Plaintiff or "Snik") (Dkt. No. 43, filed on August 26, 2020), the response of Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Defendants" or "Samsung") (Dkt. No. 54, filed on September 30, 2020), and the reply of Plaintiff (Dkt. No. 58, filed on October 7, 2020). The Court held a claim construction hearing on October 23, 2020 (*see* Dkt. No. 61). Having considered the arguments and evidence presented by the parties at the hearing and in their claim construction briefing, the Court issues this Claim Construction Order.

**Table of Contents**

**I. BACKGROUND**.................................................................................................... **3**

**II. LEGAL PRINCIPLES** ........................................................................................ **5**

**III. CONSTRUCTION OF DISPUTED TERMS** ................................................... **8**

   A.  "activation signal" and "deactivation signal" ..................................................... 9

   B.  "coupled" and "decoupled" ................................................................................ 17

**V. CONCLUSION**...................................................................................................... **22**

## I. BACKGROUND

Plaintiff sued Samsung, alleging infringement of United States Patent Nos. 9,167,329 ("the '329 patent") and 9,769,556 ("the '556 patent") (collectively, "the Asserted Patents" or "patents-in-suit"). The '556 patent is a continuation-in-part of the '329 patent. Both patents name the same inventor and are assigned to Snik.

The Asserted Patents are generally directed to a magnetic earphones holder and a set of earphones, such that electronic signals are sent to an electronic device based on the coupling status of the earphones to the magnetic holder. The '556 patent contains the same disclosure as found in the '329 patent but includes new matter related to control of "external audio." There is nothing relevant to the disputed terms that was added in the '556 patent specification; in other words, relating to the disputed terms, the specifications in both patents are substantially identical.

The '329 patent generally describes an earphones holder that is used to affix a headset to clothing and/or other items. '329 patent at Abstract. The earphones holder comprises a magnet which removably couples with a magnetically attractable portion of a set of earphones. *Id.* FIG. 11 illustrates a magnetic earphones and cord holding system according to one embodiment of the '329 patent. An electronic device controller receives a signal from an earbud engagement detector and sends a signal to the electronic device activation circuit based upon the signal received from the earbud engagement detector. *Id.* at col. 15, ll. 44–47. The electronic device activation circuit operates an electronic device based upon the signal received from the controller. The '329 patent describes an electronic device controller and an electronic device activation circuit that receives and sends signals to operate the electronic device:

> The electronic device controller 1140 receives a signal from the earbud
> engagement detector 1130 and sends a signal to the electronic device activation
> circuit 1155 based upon the signal received from the earbud engagement detector

1130. The electronic device activation circuit 1155 operates an electronic device 1105 based upon the signal received from the controller 1140. In some embodiments, the earbud engagement detector 1130 sends a signal to the controller 1140 that the one or more magnets 1185 and the earbud 1175 have been decoupled from the earphones holder body 1101. In these embodiments, upon receiving the signal from the earbud engagement detector 1130, the controller 1140 sends a signal to the electronic device activation circuit 1155 to activate the electronic device 1105. In some embodiments, the earbud engagement detector 1130 sends a signal to the controller 1140 that the one or more magnets 1185 and the earbud 1175 have been coupled with the earphones holder body 1101. In these embodiments, upon receiving the signal from the earbud engagement detector 1130, the controller 1140 sends a signal to the electronic device activation circuit 1155 to deactivate the electronic device 1105.

'329 patent at col. 15, ll. 44–64.

The Abstract of the '329 patent is reproduced below:

An earphones holder is used to affix a headset to clothing and/or other items. The earphones holder comprises a magnet which removably couples with a magnetically attractable portion of a set of earphones. In some embodiments, the earphones holder further comprises an electronic device controller which controls the operation of an electronic device. The controller is configured to send a signal to an electronic device activation circuit which operates the electronic device based upon a coupling status of the earbuds with the one or more magnetically attractable surfaces of the earphones holder body. In some embodiments, the electronic device controller controls the operation of an electronic device. The controller is configured to send a signal to an electronic device activation circuit which operates the electronic in a manner dependent upon a signal from the holder body.

Claim 1 of the '329 patent is a method claim that is generally representative of those asserted in this case. Claim 1 of the '329 patent is reproduced below:

1. A system for holding a set of earphones comprising:

a. a holder body comprising one or more magnets;

b. a set of earphones comprising a magnetically attractable surface for removably coupling with the one or more magnets; and

c. an electronic device controller coupled to receive an activation signal when one or more of the set of earphones are decoupled from one of the one or more magnets, wherein the electronic device controller receives a deactivation signal when one or more of the set of earphones are coupled to one of the one or  more magnets.

4

## II. LEGAL PRINCIPLES

### A.  Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court first examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313–14; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004). The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Id.* at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *see also Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry. . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at

1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp*., 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc*., 242 F.3d 1337, 1344 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. Echostar Satellite Corp*., 383 F.3d 1295, 1301 (Fed. Cir. 2004).

"'Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the

claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*. at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence is useful, it is "less significant than the intrinsic record in determining the 'legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc*., 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not useful. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

**B.  Departing from the Ordinary Meaning of a Claim Term**

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id*. (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

8

## III. CONSTRUCTION OF DISPUTED TERMS

The parties' positions and the Court's analysis as to the disputed terms within the claims of the '329 and '556 patents are presented below.

### A. "activation signal" and "deactivation signal"

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "activation signal" | Plain and Ordinary Meaning<br><br>(or if the Court believes a construction is necessary, "start signal") | "signal that starts an operation on an electronic device" |
| "deactivation signal" | Plain and Ordinary Meaning<br><br>(or if the Court believes a construction is necessary, "stop signal") | "signal that stops an operation on an electronic device" |

### (1) The Parties' Positions

Plaintiff argues that the terms should have their plain and ordinary meaning in light of the intrinsic evidence. *See, e.g.*, Dkt. No. 43, Plaintiff's Opening Claim Construction Brief, at 1. Plaintiff argues that the terms are readily understood by a person of ordinary skill and they require no construction. *Id*. at 5–10. Plaintiff argues that the claims make it clear that an "activation signal" is different from a "signal that starts an operation on an electronic device." *Id*. at 10–12. Plaintiff argues that the specification makes it clear that the electronic device controller or activation circuit controls an electronic device, not the activation signal. *Id*. at 12–13. Plaintiff argues that the prosecution history does not establish a clear and unmistakable disclaimer of claim scope. *Id*. at 14–16. Plaintiff argues that an "activation signal" is just a type of signal that signals another component (*i.e.*, an electronic device controller or an electronic device activation circuit) to activate an electronic device. *Id*. at 16. While an "activation signal" can "cause" transmitted audio to play on the earphones by signaling a controller or an activation circuit to activate the electronic

device (which, in turn, transmits audio to the earphones), it does not mean that the "activation signal" itself "starts an operation on an electronic device." *Id*. Plaintiff argues that Defendants' citation to extrinsic evidence is not persuasive. *Id*. at 17–18. Plaintiff argues that the language of the claims and the specification make it clear that an "activation signal" alone does not make an electronic device work for transmission of audio to the earphones. *Id*. at 18.

Defendants argue the issue is what does it mean to be an "activation" signal as opposed to any other signal. *See, e.g.*, Dkt. No. 54, Defendant's Responsive Claim Construction Brief, at 7. Defendants argue that the term should be construed because the parties dispute its scope. *Id*. at 8. Defendants argue that the term should be construed to give meaning to the term "activation." *Id*. at 9. Defendants argue that the term activation signal means a signal that activates. *Id*. Defendants further argue that the signal does not merely "cause" an operation, but that the signal actually "starts" the operation and, thus, it is different from other signals. *Id*. at 10–11. Defendants argue that Plaintiff's construction seeks to remove the "activation" nature of the signal. *Id*. at 12. Defendants argue that Plaintiff's construction is not a plain and ordinary meaning and is both too narrow and too broad. *Id*. at 14. Defendants argue that it is too narrow because there is no basis to say the signal is limited to one sent to "a controller or activation circuit" and too broad as the construction encompasses any signal. *Id*. Defendants argue that Plaintiff's alternative constructions of "start signal" and "stop signal" are only partially correct—the activation signals are more than just "start" signals, they actually work to operate the device, *i.e.*, it starts an operation. *Id*. Defendants argue that "deactivation signal" is the opposite of an "activation signal." *Id*. at 17–18.

Plaintiff replies that Defendants have provided no good argument why the terms need construction in the present litigation but not in the related *inter partes* review ("IPR") proceeding.

*See, e.g.*, Dkt. No. 58, Plaintiff's Reply Claim Construction Brief, at 2–3. Plaintiff argues that the words offered in Defendants' proposed constructions are not found in the specification. *Id*. at 4. Plaintiff argues that Defendants' proposed constructions are inconsistent with the intrinsic evidence, including both the specification and the claims. *Id*. at 5–6.

### (2) Analysis

Plaintiff argues a plain and ordinary meaning approach to these terms. Defendants argue that their constructions are necessitated upon the disclosures in the specification and to give proper meaning to the "activation" word in the disputed term. In effect, there is a dispute as to whether the terms have their plain and ordinary meaning, and more particularly, what is the plain and ordinary meaning of the terms. Both parties agree that the terms have the same meaning in both patents. Both parties agree that the terms are mirror opposites to each other and should be construed jointly; in other words, both parties agree that a "deactivation signal" is the opposite of an "activation signal." Finally, both parties agree that the specifications of the Asserted Patents are interchangeable for purposes of construing these terms.

The "activation signal" and "deactivation signal" terms are found in various independent and dependent claims in both the '329 and '556 patents. Claim 1 of the '329 patent and claim 1 of the '556 patent are representative, and are reproduced below:

> A system for holding a set of earphones comprising:
> a. a holder body comprising one or more magnets;
> b. a set of earphones comprising a magnetically attractable surface for removably coupling with the one or more magnets; and
> c. an electronic device controller coupled to receive an **<u>activation signal</u>** when one or more of the set of earphones are decoupled from one of the one or more magnets, wherein the electronic device controller receives a **<u>deactivation signal</u>** when one or more of the set of earphones are coupled to one of the one or more magnets.

Claim 1 of the '329 patent (emphasis added).

An audio system comprising:
a. a holder body comprising one or more magnetically attractable first surfaces;
b. a set of head phones each comprising a magnetic second surface for removably coupling with the one or more magnetically attractable first surfaces;
c. a headphones controller coupled to receive an **activation signal** when a magnetic decoupling is detected as one or more of the magnetic second surfaces of the set of head phones is removed and decoupled from one of the one or more magnetically attractable first surfaces, wherein the **activation signal** causes transmitted audio to be played in the headphones;
d. a first set of controls for controlling a volume of the transmitted audio played by the head phones; and
e. a second set of controls for controlling a volume of external audio played by the headphones.

Claim 1 of the '556 patent (emphasis added).

Claim 1 of the '329 patent simply requires the electronic device controller to receive an "activation signal" or a "deactivation signal" based on whether a set of earphones are coupled or decoupled with a set of magnets. Likewise, claim 1 of the '556 patent also requires the controller to receive an "activation signal" based on whether the headphones are decoupled from a magnetic surface, but additionally requires the activation signal to "cause[] transmitted audio to be played in the headphones." The claim language does not suggest that the "deactivation signal" or "activation signal" terms have anything other than their plain and ordinary meaning.

The parties mostly rely on the specification in support of their arguments. The specification does not expressly use the terms "activation signal" and "deactivation signal." Rather, the specification describes "signals" that are used to "activate" and/or "deactivate" the electronic device. For example, the '329 patent describes an electronic device controller and an electronic device activation circuit that receives and sends signals to operate the electronic device:

The electronic device controller 1140 receives a signal from the earbud engagement detector 1130 and sends a signal to the electronic device activation circuit 1155 based upon the signal received from the earbud engagement detector 1130. **The electronic device activation circuit 1155 operates an electronic device 1105 based upon the signal received from the controller 1140.** In some

12

embodiments, the earbud engagement detector 1130 sends a signal to the controller 1140 that the one or more magnets 1185 and the earbud 1175 have been decoupled from the earphones holder body 1101. **In these embodiments, upon receiving the signal from the earbud engagement detector 1130, the controller 1140 sends a signal to the electronic device activation circuit 1155 to activate the electronic device 1105.** In some embodiments, the earbud engagement detector 1130 sends a signal to the controller 1140 that the one or more magnets 1185 and the earbud 1175 have been coupled with the earphones holder body 1101. **In these embodiments, upon receiving the signal from the earbud engagement detector 1130, the controller 1140 sends a signal to the electronic device activation circuit 1155 to deactivate the electronic device 1105.**

'329 patent at col. 15, ll. 44–64 (emphasis added). Although the terms "activation signal" and "deactivation signal" are not used, the specification is clear that the controller sends a signal to the electronic device activation circuit to activate or deactivate the electronic device. *See id*. In this embodiment, it is the electronic device activation circuit that operates the electronic device based upon the signal received from the controller. *See id*. This specification support is consistent with the Abstract of the '329 patent, which likewise requires a controller to send a signal to the electronic device activation circuit to activate or deactivate the electronic device.

Overall, the Court finds that the specification confirms that the "activation signal" and "deactivation signal" terms have no special meaning. The Court finds that there is no express limitation, definition, or disavowal in the specification regarding these terms. *See, e.g., GE Lighting Sols.*, 750 F.3d at 1309 ("the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal") (citation omitted).

Defendants' arguments focus on the alleged "function" that the activation signal performs. Defendants argue that the inherent meaning of the "activation signal" term is a signal that activates something (such as turning on or starting an operation). Defendants rely on a portion of the specification that contrasts activating the electronic device to other controller operations:

> The electronic device activation circuit 1955 operates an electronic device 1905 based upon the signal received from the controller 1940. For example, in some embodiments, the touch sensor detector 1960 sends a signal to the electronic device controller 1940 that the touch sensor 1903 has been tapped, double-tapped, and/or swiped. In response, the electronic device controller 1940 sends a signal to the electronic device activation circuit 1955 to operate the electronic device 1905. **In some embodiments, the electronic device controller 1940 is able to send a signal to activate/de-activate the electronic device, turn up or turn down the volume, change the playing media, and/or change the program being operated by the electronic device 1905.** Particularly, the electronic device controller 1940 is able to send any appropriate desired control signal to the electronic device 1905. Additionally, the touch sensor 1903 is able to be operated in any desired manner.

'329 patent, col. 21, ll. 43–59 (emphasis added). In particular, Defendants argue that the specification contrasts activating / deactivating an electronic device with other operations, such as turning up or down the volume, changing the playing media, or changing the program. *See id*.

Defendants' arguments and citations to the specification are not persuasive. First, the portions of the specification Defendants cite in support of their arguments do not use the term "start an operation" or "stop an operation" and does not otherwise equate the disputed terms to the limitations proposed by the Defendants. *See generally* '329 patent; *see also id*. at col. 21, ll. 51–56. Indeed, during the claim construction hearing, counsel for the Defendants was unable to provide any meaningful definition to the term "operation." Defendants fail to point to anything in the specification that specifically disclaims or defines the "activation signal" or "deactivation signal" terms in the manner proposed by Defendants.

Second, the claim language does not require the limitations proposed by the Defendants. Had the patentee wanted to specifically limit the terms as proposed by Defendants, it could have easily done so in the claims. Further, nothing in the specification or the claims requires an activation signal – by itself – to start or stop an operation on "an electronic device."

Third, even if the Defendants are correct that the specification contrasts activating and deactivating to other operations, the Court finds that the examples in the specification are non-limiting embodiments of the invention that should not be imported into the claims. The Federal Circuit has consistently held that "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water,* 381 F.3d at 1117. Even where a patent describes only a single embodiment, absent a "clear intention to limit the claim scope," it is improper to limit the scope of otherwise broad claim language by resorting to a patent's specification. *Id.*; *see also Liebel-Flarsheim Co.*, 358 F.3d at 906 (citing numerous cases rejecting the contention that the claims of the patent must be construed as being limited to the single embodiment disclosed and stating that claims are to be given their broadest meaning unless there is a clear disclaimer or disavowal); *Comark Commc'ns*, 156 F.3d at 1187 ("Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."); *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) ("even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words of expressions of manifest exclusion or restriction.") (citations omitted); *Phillips*, 415 F.3d at 1323.

Overall, the Court rejects Defendants' arguments. On its face, the claim language is clear. The claim language does not require the limitations proposed by Defendants. Further, the Court finds that there is no lexicography, disavowal, or disclaimer in the specification to require the limitations suggested by Defendants and rejects Defendants' arguments to the contrary. The Court finds that the simple "activation signal" term is inherently broad and could apply even to a "wake-up signal" as proposed by Plaintiff's counsel during the claim construction hearing. The Court

rejects Defendants' attempt to necessarily require the activation signal to "start an operation on an electronic device," as that is unduly limiting and unclear at best. The Court finds that one of ordinary skill in the art, based upon the specification and the claims, would understand each of the disputed terms to have its plain and ordinary meaning.

Nevertheless, to resolve the dispute between the parties, on balance, the Court finds that construing the terms is necessary and helpful. Plaintiff proposes (as an alternative) that the terms simply mean a "start signal" and a "stop signal." Defendants' construction similarly includes a "start" limitation for the activation signal and a "stop" limitation for the deactivation signal. Defendants do not argue that Plaintiff's alternative constructions are not correct, but instead argue that they are only "partially" correct. The Court finds that there is some support in the specification for the terms "start" and "stop." *See, e.g.*, '329 patent, col. 16, ll. 20–23. On balance, the Court finds that Plaintiff's alternative constructions for these terms are most appropriate.

The Court hereby construes:

- the term "**activation signal**" to mean a "**start signal**;" and

- the term "**deactivation signal**" to mean a "**stop signal**."

### B.  "coupled" and "decoupled"

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "decoupled" | Plain and Ordinary Meaning<br><br>(or if the Court believes a construction is necessary, "disconnected or disassociated") | "physically separated" |
| "coupled" | Plain and Ordinary Meaning<br><br>(or if the Court believes a construction is necessary, "connected or associated") | "physically connect(ed)" |

### (1) The Parties' Positions

Plaintiff argues that the terms should have their plain and ordinary meaning in light of the intrinsic evidence and do not require construction. *See, e.g.*, Dkt. No. 43, Plaintiff's Opening Claim Construction Brief, at 1, 19. Plaintiff argues that coupled means directly or indirectly connected and is not limited to a "physical" connection. *Id*. at 19–22. Plaintiff argues that a typical understanding of "coupled" includes direct or indirect connections. *Id*. at 21. Plaintiff argues that the specification makes it clear that the terms "coupled" and "decoupled" do not require a physical connection or physical separation. *Id*. at 25–27. Plaintiff argues that the prosecution history does not establish a clear and unmistakable disclaimer of claim scope. *Id*. at 27–29. Plaintiff argues that magnetic coupling / decoupling can occur regardless of whether the magnets / magnetically attractable surfaces are "physically connected" or "physically separated." *Id*. at 29. Plaintiff argues that "couple"—as used in the patents-in-suit—can apply to non-physical, indirect connection of two items. *Id*. at 30.

Defendants argue that the term is limited by a disclaimer theory based on representations made to the Patent Office during prosecution of the '556 patent. *See, e.g.*, Dkt. No. 54, Defendant's Responsive Claim Construction Brief, at 18. Defendants argue that if the Court disagrees that there

was a disclaimer, then no construction is required. *Id*. Defendants argue that the patentee disclaimed "proximity" during prosecution of the '556 patent based on the Harper prior art. *Id*. at 20–22. Defendants argue that the inventor (via extrinsic evidence) described his invention as requiring physical connections formed by a circuit. *Id*. at 23.

In its Reply, Plaintiff argues that there is no clear and unmistakable disavowal of claim scope. *See, e.g.*, Dkt. No. 58, Plaintiff's Reply Claim Construction Brief, at 7. Plaintiff argues that nowhere in the prosecution history did the patentee state that the coupling term is limited to a physical connection and the decoupling term is limited to a physical separation. *Id*. at 8. Plaintiff further argues that the term "coupled" should be construed consistently within the patents, but Defendants' position requires different constructions for different usages of the terms. *Id*. at 9–10. Plaintiff further argues that Defendants' arguments improperly rely on extrinsic evidence and from a purported embodiment of the claims. *Id*. at 10.

#### (2) Analysis

The parties dispute whether plain and ordinary meaning applies to these terms based on the alleged presence of a prosecution history disclaimer. Defendants admit that if the Court disagrees that there is a disclaimer, then no construction is required. *See, e.g.*, Dkt. No. 54 at 18. In other words, Defendants agree that neither the claims nor the specification require the construction proposed by Defendants, and the focus is solely on the prosecution history of the continuation-in-part '556 patent. For the reasons detailed below, the Court finds that there is no prosecution history disclaimer, and thus the plain and ordinary meaning applies to these terms.

The "coupled" and "decoupled" terms appear in claims in both the '329 patent and the '556 patent. Overall, the Court finds that the claims and specification provide no special meaning to the "coupled" and "decoupled" terms; indeed, there is no genuine dispute between the parties on this

issue. The Court focuses its analysis on the relevant prosecution history, the effect of which is disputed between the parties. The parties do not argue that any prosecution history disclaimer appeared in the parent '329 patent. However, the parties do dispute whether a disclaimer appeared in the prosecution history of the continuation-in-part '556 patent. In particular, Defendants argue that the patentee disclaimed "proximity" during prosecution of the '556 patent based on statements related to a prior art reference. *See, e.g.*, *id*. at 20–22.

During prosecution of the claims leading to the '556 patent, the Examiner cited U.S. Patent Publication No. 2013/0129110 ("Harper") as a prior art reference to the then-pending claims. *See, e.g.*, Dkt. Nos. 54-11, 54-14 (February 5, 2016 Office Action and June 20, 2016 Office Action). During prosecution of the '556 patent, the Applicant argued around the Harper prior art. In particular, and the portion of the prosecution history on which Defendants primarily rely, the Applicant distinguished the pending claims from Harper:

> Within the Response to Arguments section of the Office Action, it is stated that Harper explicitly teaches that the signal is sent to the control module and Paragraph 0050 of Harper is referenced. The Applicants respectfully disagree. In Paragraph 0050 of Harper, it is taught
>
> > In another alternative embodiment of the present invention, the headphone system may include a system that sends a varying signal to the remote control module *based on the proximity of two magnets*, which are included in first and second coupling devices, respectively, and connected to each earbud/headphone. For instance, when the magnets of the first and second coupling devices are in very *close proximity **but** not fully coupled*, one signal could be sent to the control module, and, when they are *in further proximity* (but still sufficiently within their magnetic field), a different signal could be sent to the control module. In a non-limiting embodiment, this system could, for example, be constructed through multiple reed switches that are each set to close at increasingly strong magnetic fields. [Harper, ¶ 0050, emphasis added]
>
> Harper does not teach a controller coupled to receive an activation signal when one or more of magnetic second surfaces of the set of head phones are ***decoupled*** from one or more of magnetically attractable surfaces of a holder body. As described above, Harper teaches that a varying signal is sent to the remote control module based on the *proximity of two magnets*, not on a magnet being ***decoupled***.

*See, e.g.*, Dkt. No. 54-15 (August 11, 2016 Amendment and Response). Defendants argue that this portion of the prosecution history is a clear and unmistakable disclaimer regarding "proximity." Specifically, it is a clear and unmistakable disclaimer that the term "decoupled" means "physically separated" and the term "coupled" means "physically connected." Defendants argue that because any proximity was disclaimed, "decoupled" has to be binary—as in physically separated—and the term "coupled" must also be binary—as in physically connected. The Court disagrees.

On balance, Defendants' arguments and citations to the prosecution history are not persuasive. To disavow or disclaim the full scope of a claim term, the patentee's statements in the prosecution history must amount to a "clear and unmistakable" surrender to one of skill in the art. *See, e.g., Cordis Corp.*, 561 F.3d at 1329; *Tech. Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1357–58 (Fed. Cir. 2017). The Court finds that the statements by the Applicant do not rise to the level of a clear and unambiguous disclaimer as required by case law. Besides failing to be a clear and unmistakable disclaimer, any potential disclaimer in the prosecution history does not even match the limitations proposed by Defendants. At no point did the Applicant equate "coupled" to "physically connected" or equate "decoupled" to "physically separated." The Applicant simply did not equate the concept of coupling with touching or physical contact. Instead, the Applicant merely stated that the disclosure in the Harper reference did not teach the limitations in the pending claims, and more particularly that varying a signal based on the proximity of two magnets does not equate to sending an activation signal when the headphones are decoupled. *See, e.g.*, Dkt. No. 54-15 (August 11, 2016 Amendment and Response).

Such a characterization of the prior art does not meet the high bar Defendants needed to establish a specific disclaimer, much less one that requires the specific limitations advanced by Defendants. At best, the Court finds that the language relied upon by Defendants is entitled to

multiple interpretations, and thus cannot be seen as a clear and unmistakable disclaimer. *Tech. Props.*, 849 F.3d at 1358 ("If the challenged statements are ambiguous or amenable to multiple reasonable interpretations, prosecution disclaimer is not established.") (citation omitted); *3M Innovative Props.*, 725 F.3d at 1326 ("Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable."). Further, because the Court finds that no disclaimer is applicable, the Court need not rule on whether prosecution disclaimer in the '556 patent would apply to the '329 patent, its parent patent.

Overall, the Court rejects Defendants' arguments. On its face, the claim language is clear. The claim language does not require the limitations proposed by Defendants. Further, the Court finds that there is no lexicography, disavowal, or disclaimer in the specification to require the limitations suggested by Defendants and rejects Defendants' arguments to the contrary. In particular, the Court finds that there is no disclaimer in the prosecution history as argued by the Defendants. Where, as here, a disavowal does not exist, the ordinary and customary meaning of the claim term will be given its full effect. The Court finds that one of ordinary skill in the art, based upon the specification and the claims, would understand each of the disputed terms to have its plain and ordinary meaning.

Because this resolves the dispute between the parties, the Court finds that no other terms within the disputed phrase requires further construction. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe *every* limitation

present in a patent's asserted claims.") (citing *id*.). Indeed, the Defendants admit that if no disclaimer is found, then a construction is not necessary.

The Court hereby construes:

- the term "**decoupled**" to have its plain and ordinary meaning; and

- the term "**coupled**" to have its plain and ordinary meaning.

## V. CONCLUSION

The Court adopts the above constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 6th day of November, 2020.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE